UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| RUBEN NAVARRO, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 7:12-CV-66 |
| | § | |
| CITY OF SAN JUAN, TEXAS, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER GRANTING DEFENDANT RODRIGUEZ'S
## MOTION FOR SUMMARY JUDGMENT

**I.    Factual and Procedural Background**

Now before the Court is the "Motion for Summary Judgment and Assertion of Qualified Immunity" (Dkt. No. 83) filed by Defendant Humberto ("Bobby") Rodriguez.[1] This action filed in state court on January 30, 2012, and removed to this Court on February 12, 2012, arises from certain Plaintiffs' involvement with a failed petition to recall four Commissioners of the Defendant City of San Juan, Texas ("the City") "due to inefficiency and mismanagement of city affairs." (Dkt. No. 1 at ¶ 13).[2] Even after successive amendments to their complaint, Plaintiffs' allegations are sprawling. The Court's best summary of Plaintiffs' Sixth Amended Complaint is that Plaintiffs Ruben Navarro, Gloria Martinez, Yolanda Alvarado, and Ramiro Trevino (collectively, "Recall Plaintiffs") initiated the recall petition under the authority of the City Charter in the fall of 2010. (Dkt. No. 104 at ¶ 13; *see also* ¶ 72). Plaintiffs allege that Defendants Rodriguez, J. Jerry Munoz, Ricardo Tamez, Rodolfo Luna, and Juan Gonzalez then worked individually and in concert with one another, and with others, to undermine Recall

---

[1] Numerous other motions for summary judgment are also pending, and will be addressed separately. *See* (Dkt. Nos. 26, 60, 79, 84, 85, 88, 94).
[2] Plaintiffs are no longer pursuing this action against any Commissioner. *See* (Dkt. No. 100).

1 / 20

Plaintiffs' efforts. Defendants' own efforts allegedly took advantage of a requirement in the City Charter that the petition "have an affidavit of the circulator stating that he, and he only, personally circulated the [petition]…, that all signatures were made in his presence, and that he believes them to be the genuine signatures of the persons whose names they purport to be." *Id.* at ¶ 15. Plaintiffs admit that J.J. Garcia, a "close friend" of one of the Commissioners targeted by the recall petition, assisted Recall Plaintiffs in circulating the petition. *Id.* at ¶¶ 14, 22.[3] Plaintiffs allege that Garcia's real motive was to undermine the petition "by lying to the [signers]…that their signatures were needed for a petition to the City to issue a permit for a taco stand." *Id.* at ¶ 14; *see also* ¶ 22. On or about November 22, 2010, Recall Plaintiffs met with Plaintiff and notary public Elisa Sanchez ("Notary Sanchez") for the purpose of notarizing the "authenticity affidavits" required by the City Charter. *Id.* at ¶ 15. Recall Plaintiffs submitted the petition, supported by the authenticity affidavits and 1,438 signatures, to City Secretary Rodriguez on December 3, 2010. *Id.* at ¶ 16. In alleged contravention of the City Charter, Rodriguez forwarded the list of signers to City Attorney Munoz on December 8, 2010. *Id.* at ¶ 18. On the same date, Munoz gave private investigator Tamez the assignment of visiting targeted signers to obtain their signatures on pre-made affidavits stating that they did not intend to sign the recall petition. *Id.* at ¶¶ 18, 19. Tamez allegedly used "coercive tactics" to obtain 51 signatures on the pre-made affidavits. *Id.* at ¶ 26. On December 23, 2010, Tamez reported to Luna, a Sergeant with the City Police Department, that Tamez "discovered while obtaining voters' signatures…that the voters were 'misled, lied [to], deceived, their signatures were forged, and some never met with circulators….'" *Id.* at ¶ 19.

On January 3, 2011, Rodriguez provided written notice to Recall Plaintiffs of his

---

[3] The Court denied Plaintiffs' motion for leave to add J.J. Garcia as a defendant to this action. (Dkt. No. 64).

determination that less than the required number of qualified voters had signed the recall petition. *Id.* at ¶ 23. Plaintiffs allege that only 83 of the 489 voters disqualified by Rodriguez were in fact not qualified to sign the petition. *Id.* at ¶ 25. Plaintiffs also complain that the "lies" allegedly uncovered by Tamez were those told by Garcia, and that Tamez reported as "forged" those signatures that had been signed with permission. *Id.* at ¶ 74. Further, approximately 29 of the 51 persons who signed the pre-made affidavits "retracted" their signatures on the grounds that Tamez had coerced them to sign. *Id.* at ¶ 26. On January 13, 2011, Recall Plaintiffs submitted an amended recall petition with 1,418 signatures. *Id.* at ¶ 27. Plaintiffs allege that Rodriguez's failure to take any action on the amended petition again contravened the requirements of the City Charter. *Id.*

Meanwhile, the City Police Department through its Chief, Gonzalez, and through Sergeant Luna, was conducting a criminal investigation into Recall Plaintiffs and Notary Sanchez. *Id.* at ¶¶ 28, 29. On or about January 30, 2011, with Gonzalez's support, Luna requested and obtained warrants from City Magistrate Ricardo Perez for the arrests of Recall Plaintiffs and Notary Sanchez on multiple counts of the Texas felony offense of tampering with a governmental record. *Id.* at ¶¶ 30, 31, 38.[4] Gonzalez and Luna then gathered a team of City police officers and law enforcement officers from other agencies to begin serving the warrants. *Id.* at ¶ 32. Recall Plaintiff Martinez and the Navarro Plaintiffs,[5] Alvarado Plaintiffs,[6] and Sanchez Plaintiffs[7] all complain of conduct by officers during the service of the warrants. *Id.* at ¶¶ 33-35, 37. Subsequent to the arrests of Recall Plaintiffs and Notary Sanchez, Magistrate

---

[4] The Court denied Plaintiffs' motion for leave to add Magistrate Perez as a defendant to this action. (Dkt. No. 64).
[5] The Navarro Plaintiffs are Recall Plaintiff Navarro and Minerva Navarro, individually and as next friend of M.V.N.; Preston R. Navarro; and Brandon R. Navarro.
[6] The Alvarado Plaintiffs are Juan Luis Alvarado and Sandy Alvarado, but do not include Recall Plaintiff Alvarado.
[7] The Sanchez Plaintiffs are Notary Sanchez and Cesar Jaime Sanchez.

Perez set bail bond conditions which included "staying away from any city employees, not engaging in any similar conduct, not associating with any of the other criminally accused…, and staying 500-feet away from any elected official." *Id.* at ¶ 38. On September 14, 2011, a grand jury returned a "no bill" on all charges against Recall Plaintiffs and Notary Sanchez. *Id.* at ¶ 42.

On these and additional factual bases, pursuant to 42 U.S.C. § 1983,[8] Plaintiffs seek to hold Defendants liable for violating and conspiring to violate Plaintiffs' rights under the First, Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution. *Id.* at §§ V-VIII, XI. Pursuant to 28 U.S.C. § 2201, Plaintiffs seek a declaratory judgment that the arrest warrant form used by the City for longer than ten years, and by Luna in requesting and obtaining warrants in this case, violates Texas Code of Criminal Procedure article 15.02 and the Fourth Amendment. *Id.* at §§ IX, XI. Recall Plaintiffs and Notary Sanchez also seek relief in the form of expunction of their arrest records "due to deprivation of constitutional rights within the meaning of 42 U.S.C. § 1983." *Id.* at §§ X, XI. Finally, Plaintiffs seek to recover attorneys' fees under 42 U.S.C. § 1988. *Id.* at § XI.

The instant Motion characterizes Plaintiffs' complaint against Rodriguez, sued in his individual capacity, as involving only "his actions as City Secretary in declaring the recall petition insufficient," and assert that Plaintiffs lack evidence to support any of the asserted § 1983 violations and requests for relief. (Dkt. No. 83). Rodriguez also asserts the defense of qualified immunity to the claims against him. *Id.* Upon consideration of the Motion, responsive briefing, and summary judgment evidence, in light of the relevant law, the Court finds that the Motion must be granted for the following reasons.

---

[8] Plaintiffs' complaint also makes two references to 42 U.S.C. § 1985, but does not assert any cause of action under this section. (Dkt. No. 104 at ¶¶ 1, 38; *see* § VIII).

## II.     Rodriguez's Motion for Summary Judgment

### A.     Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c). Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c). In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006). However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

## B. Overview of Applicable Law

Section 1983 provides a claim against any "person" who, "under color of any statute, ordinance, regulation, custom, or usage, of any State," violates another's rights under the U.S. Constitution. 42 U.S.C. § 1983; *e.g.*, *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013). Thus, a § 1983 claim has two main elements: (1) the violation of a federal constitutional right (2) by a person acting under color of state law. *See Whitley*, 726 F.3d at 638. A plaintiff may bring a § 1983 claim against a person in his individual or official capacity, or against a local government entity. *Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (municipalities and other local government units are "persons" subject to suit under § 1983). A defendant sued in his individual capacity may assert the defense of qualified immunity, a doctrine that "protects government officials from civil damages liability when their actions could reasonably have been believed to be legal." *Whitley*, 726 F.3d at 638 (quoting *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)) (internal quotations omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). A plaintiff seeking to overcome a qualified immunity defense must show that (1) the defendant violated a federal constitutional right and (2) that the right was "clearly established" at the time of the challenged conduct. *Whitley*, 726 F.3d at 638 (quoting *al-Kidd*, 131 S.Ct. at 2080). A court has discretion to decide which prong to consider first. *Id.* A right is clearly established when "the contours of the right [are] sufficiently clear [such] that a reasonable official would understand that what he is doing violates that right." *Morgan*, 748 F.3d at 244 (quoting *Anderson v. Creighton*, 483 U.S.

635, 640 (1987)) (internal quotations omitted).

## C. Fourth Amendment and Due Process Claims and Requests for Declaratory Judgment and Expunction

Plaintiffs make no response to Rodriguez's request for summary judgment on any claim that he violated any Plaintiff's (1) Fourth Amendment rights to be free from unlawful search and seizure, false arrest, and excessive force; or (2) Fifth and Fourteenth Amendment rights to be free from the deprivation of liberty without due process. (Dkt. No. 83; *see* Dkt. No. 107). The Court agrees with Rodriguez that the focus of Plaintiffs' allegations and evidence are Rodriguez's actions (or inaction) as City Secretary upon receipt of the initial and amended recall petitions, and Rodriguez has presented his deposition testimony that he had no part in the decision to have any Plaintiff arrested or charged with any crime. *See* (Depo D1 at pp. 158-59).[9] As discussed herein, Plaintiffs take the position that Rodriguez aided the criminal investigation that led to the issuance of warrants and certain Plaintiffs' arrests by giving Munoz the list of petition signers, but any connection between Rodriguez's action and the asserted Fourth Amendment and due process violations is too conjectural and remote to defeat summary judgment. *See* (Dkt. No. 107). Therefore, the Court will grant Rodriguez's Motion with respect to any claim that he violated the Fourth Amendment and due process rights of any Plaintiff. Plaintiffs' requests for a declaratory judgment that the City's arrest warrant form is unconstitutional, and for expunction of certain Plaintiffs' arrest records, cannot be obtained from this Defendant or on the basis of any constitutional violation committed by him. Therefore, the Court will also enter summary judgment in his favor on these requests for relief.

---

[9] Rodriguez submitted his summary judgment evidence in CD form. The Court's docket does not reference the CD but does include Rodriguez's summary and index of the evidence contained therein. (Dkt. No. 86). The Court will use the abbreviations provided in the index when citing to the evidence.

**D.     First Amendment Claims**

**1.     Overview of Applicable Law**

In relevant part, the First Amendment provides that "Congress shall make no law…abridging the freedom of speech…or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I.  This prohibition is made applicable to the States through the Fourteenth Amendment.  *E.g.*, *Meyer v. Grant*, 486 U.S. 414, 420 (1988).  Further, it encompasses "not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities."  *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (citing *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999)).  This is because "if government officials were permitted to impose serious penalties in retaliation for an individual's speech, then the government would be able to stymie or inhibit his exercise of rights in the future and thus obtain indirectly a result that it could not command directly." *Id.* (citing *Colson*, 174 F.3d at 509-10; *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).  Where, as here, a case "does not involve an employment or other contractual relationship between the plaintiff[ ] and the governmental official[ ]," a First Amendment retaliation claim has the following three elements: (1) the plaintiff was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury "that would chill a person of ordinary firmness from continuing to engage in that activity," and (3) the defendant's adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct.  *Id.*

**2.     First Amendment Claims against Rodriguez and Overview of Parties' Arguments for and against Summary Judgment**

Recall Plaintiffs and Notary Sanchez (for purposes of the following sections, "Plaintiffs") assert two First Amendment causes of action for: (1) violation of their First Amendment rights to

freedom of speech, freedom of association, and right to petition; and (2) retaliation for the exercise of those rights. (Dkt. No. 104 at §§ VI-A, V-B).[10] As to Rodriguez, Plaintiffs appear to allege that his actionable conduct consists of his failure to follow the City Charter upon receipt of the initial and amended recall petitions, for the intended purpose of ensuring the failure of the petition. *See id.* at ¶¶ 16-18, 23-25, 27, 47. Rodriguez does not appear to dispute that the alleged protected activity—the petition to recall four City Commissioners "due to inefficiency and mismanagement of city affairs," circulated and submitted through association with one another and with voters—is protected by the First Amendment. *See* (Dkt. No. 83); *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 186 (1999) ("Petition circulation…is core political speech because it involves interactive communication concerning political change.") (quoting *Meyer*, 486 U.S. at 422) (internal quotations omitted); *Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 898 n.13 (5th Cir. 2012) ("The circulation and submission of an initiative petition is closely intertwined with the underlying political ideas put forth by the petition. The *petition itself* is the protected speech. Moreover, the very nature of a petition process requires association between the third-party circulator and the individuals agreeing to sign.") (citing *Meyer*, 486 U.S. at 422) (emphasis in original). However, his Motion asserts that the record establishes no violation of this right because Rodriguez did not prevent Plaintiffs from circulating and submitting the petition. (Dkt. No. 83). Further, he committed no First Amendment violation or retaliation, and is entitled to qualified immunity as to the same, since "his actions were consistent with the City Charter and the information registered with the Secretary of State, and Plaintiffs have no evidence to establish otherwise." *Id.* In response, Plaintiffs purport to show that Rodriguez's actions did not accord with the Charter, and that he disqualified legally qualified voters, all in violation of the First Amendment. (Dkt. No. 107).

---

[10] The remaining Plaintiffs do not assert causes of action for violation of their First Amendment rights.

### 3. Rodriguez's Summary Judgment Evidence

### a. City Charter Provisions

Rodriguez presents evidence that on or about December 3, 2010, Recall Plaintiffs submitted an "Original Petition for Recall Election" of City Commissioners Bob Garza, Lupe Rodriguez, Armando Garza, and Heriberto Suarez. (Aff 1; Depo D1 at p. 21, Exhs. 3, 5). Section 11.07 of the "Home Rule Charter of the City of San Juan" provides as follows:

> SECTION 11.07    POWER OF RECALL:
>
> *The people of the City* reserve the power to recall any elected officer of the City and *may exercise such power by filing with the City Secretary a petition signed by at least 10% of the qualified voters in the last City election*, but not less than two hundred (200) voters, demanding the removal of such elected officers. *The petition shall be signed and verified in the manner required for an initiative petition.*

(Aff 1-A at § 11.07) (emphasis added). Section 11.03 sets forth the form a petition must take, stating in relevant part:

> SECTION 11.03    FORM OF PETITIONS:
>
> [E]ach signer shall sign his name in ink or indelible pencil, together with a notation showing his residence address. *No signature shall be counted where there is reason to believe it is not the actual signature of the purported signer* or that it is a duplication of name and no signature shall be counted unless the residence address of the signer is shown. *Attached to each separate petition paper there shall be an affidavit of the circulator thereof that he, and he only, personally, circulated the foregoing paper*, that it bears a stated number of signatures, *that all signatures appended thereto were made in his presence, and that he believes them to be the genuine signatures of the persons whose names they purport to be.*

*Id.* at § 11.03 (emphasis added). The ensuing section 11.04 describes the City Secretary's duties upon receipt of a petition: within thirty (30) days of its filing, he "shall determine whether the [petition] is properly signed by the requisite number of qualified voters," disqualify any signers found not qualified, and certify the result to the City Commission at its next regular meeting. *Id.*

at § 11.04; *see also* § 11.08 (§ 11.04 "shall apply to recall petitions"). If the Secretary finds the petition insufficient, he must notify the filer and allow the petition to be amended within ten (10) days. *Id.* at § 11.04. Within thirty (30) days of the filing of an amended petition, the Secretary "shall examine the amended petition and certify as to its sufficiency." *Id.* If the amended petition is still found insufficient, "no further proceedings shall be had with regard to it." *Id.*

**b.    Rodriguez's Actions upon Receipt of Recall Petition**

Rodriguez's affidavit states that upon its submission, Recall Plaintiffs' petition "became an official document or record of the City of San Juan." (Aff 1). Its submission also triggered Rodriguez's duties as City Secretary under the Charter. *See id.* Rodriguez had previously received the advice of outside legal counsel, Bradford Bullock, that the number of signatures necessary to proceed with a recall petition, *i.e.*, 10% of the qualified voters in the last City election, was 1,414. (Aff 1-B; Depo D1 at pp. 21-23, 42-43). Rodriguez believed that further assistance was needed from "an expert in these kinds of petitions," Alan Bojorquez, and spoke to Munoz about reaching out to Bojorquez. (Depo D1 at pp. 33-34). Munoz did not advise Rodriguez on the interpretation of the Charter, as both agreed that they needed independent advice. *Id.* at p. 34. Rodriguez testified that he "wanted to make sure that we were transparent and we were given the best advice," "that the petitioners were treated fairly and that the City was treated fairly," "that I myself not choose sides," and that "we followed the law." *Id.* at pp. 34-35, 151.

Guided by the advice of outside legal counsel regarding the standards that needed to be met for each signature, Rodriguez reviewed the list of petition signers to determine whether the signers were registered voters in the City of San Juan. (Aff 1); *id.* at pp. 72-73. To make this determination, Rodriguez used the Secretary of State election website, which requires a voter

registration number, Texas driver's license number, and/or name and date of birth to verify whether a person is a registered voter. (Aff 1). Rodriguez looked to the petition for this information, along with the signer's precinct number and address. *Id.* Bullock separately reviewed the petition and both concluded that it lacked the requisite number of qualified voter signatures. (Depo D1 at p. 73).

By letter dated January 3, 2011, Rodriguez notified Plaintiffs' counsel of the deficiency and that they had ten days from the date of the letter to file an amended petition. (Aff 1-C). An email dated February 11, 2011 from Bullock to Rodriguez indicates Bullock's findings that even if all 77 of the additional signatures submitted by Plaintiffs were valid, Plaintiffs still had not obtained the requisite number of signatures. (Aff 1-D). Rodriguez therefore notified Plaintiffs' counsel by letter dated February 14, 2011 that "[p]ursuant to [section] 11.04 of the City Charter the amended petition is found to be insufficient, [and] no further proceedings shall be had with regard to the December 3, 2010 recall petition." (Aff 1-E).

Rodriguez's affidavit admits that one of the signers he disqualified was Recall Plaintiff Navarro, due to "the lack of correct information in the petition to identify her as a registered voter." (Aff 1). Rodriguez explains that he first determined that Navarro "did not provide the correct voter identification number or driver's license number listed by the Secretary of State for her name." *Id.* He then referenced her name and date of birth, which reflected that she was registered to vote in Precinct 118 rather than the precinct listed for her in the petition, Precinct 4. *Id.*

Rodriguez testified that the Commissioners who were the subject of the petition "stopped by" at different times to look at the petition and to see the names on the list, and that Rodriguez showed the petition to them. *Id.* at pp. 97-98. He recalled Commissioner Suarez expressing his

concern that one of the signers was related to Suarez, and that Rodriguez responded, "[N]othing I can do about that." *Id.* at p. 99.

 c. **Plaintiffs' Testimony Regarding Rodriguez's Actions**

Recall Plaintiffs' deposition excerpts submitted by Rodriguez provide the following testimony regarding this Defendant's actions during the recall process. Navarro complained that Rodriguez "released government documents." (Depo P1 at pp. 55-56). Martinez had no complaint about Rodriguez. (Depo P3 at p. 57). Alvarado testified that Rodriguez "disqualif[ied] voters that were registered voters and had voted for many years," such as Recall Plaintiff Navarro. (Depo P4 at pp. 17, 99). Trevino complained of "ridicule" and "harassment" by the City Secretary and others, but pointed to no specific instances of harassment by Rodriguez. (Depo P7 at pp. 25, 27).

 4. **Plaintiffs' Summary Judgment Evidence**

Plaintiffs also submit a copy of the City Charter and cite to an additional provision which states in relevant part:

> SECTION 11.01  POWER OF INITIATIVE
>
> > The people of the City reserve the power of direct legislation by initiative, and in the exercise of such power may propose any ordinance.... Any initiated ordinance may be submitted to the City Commission by a petition signed by qualified voters of the City equal in number to at least 10% of the qualified voters voting the last City election, but not less than two hundred (200 voters).

(Dkt. No. 113, Exh. A).

Plaintiffs' evidence also includes excerpts from Rodriguez's deposition. (Dkt. No. 115, Exh. D). The testimony highlighted by Plaintiffs' response includes Rodriguez's stated belief that the Charter is "vague" and "needs to be amended in some…areas." *Id.* at p. 148; *see* (Dkt. No. 107). Plaintiffs also point to Rodriguez's admissions that he discussed the recall petition

with City Attorney Munoz and provided copies of the petition's "signature sheets" to Munoz, and that he did not request updated voter records from the County elections department to aid him in reviewing the petition signatures. (Dkt. No. 115, Exh. D at pp. 93, 101-04, 126-27, 175-76). When questioned as to why he disqualified Recall Plaintiff Navarro, Rodriguez responded that he made the determination based on the information given and "would have to go back and look as to why that happened." *Id.* at pp. 187-88. Counsel further inquired whether Rodriguez could have requested that a City police officer visit Navarro to verify her signature, to which Rodriguez responded in the affirmative but qualified that he "would have had to [do] that with a lot of other folks, too." *Id.* at p. 191. Finally, Plaintiffs point to Rodriguez's admission that the Commissioners subject to the attempted recall were in office at the time of Rodriguez's hiring. *Id.* at p. 166. When asked whether he thought that his job would be in jeopardy if the recall succeeded, Rodriguez responded, "I think anytime that you have a new commission, your job, as being an appointed official, there's that—that reality that that could happen…." *Id.*

Plaintiffs also submit the affidavits of Recall Plaintiffs Trevino and Alvarado stating that "the City Secretary took more than the 30 days allowed by the city charter to notify us that we did not meet the requisite number of voters"; specifically, they complain that Rodriguez provided notice 32 days after submission of the petition, and that he did so "intentionally…to keep us…from successfully completing the recall process." (Dkt. No. 113, Exh. B). Alvarado further attests to her belief that Rodriguez provided Munoz with a copy of the recall petition signatures "so that…Munoz would begin his criminal investigation against me and against the other [Recall Plaintiffs]." *Id.* Plaintiffs submit invoices from private investigator Tamez reflecting his December 8, 2010 hiring by Munoz, and that Tamez conducted interviews and obtained affidavits of recall petition signers through December 15, 2010. (Dkt. No. 115, Exh. E).

Recall Plaintiff Navarro's affidavit explains that she has resided at the same address in the City of San Juan for ten years, and that she is an "active voter" who has voted in City elections for over 31 years.  (Dkt. No. 114, Exh. C).  According to Navarro, she has "never had a problem being allowed to vote" since she has "always kept [her] information current with the election department."  *Id.*  Nonetheless, her voluntary signature on the recall petition was disqualified for reasons unknown to her, although she appears to offer a potential reason: she states that "there is another voter in this City…whose name is Minerva O. Navarro."  *Id.*[11] Navarro complains that Rodriguez "did not contact me by telephone or in person nor did I receive a call from any employee from City Hall attempting to confirm my identity and voter status."  *Id.*  She further expresses her belief that Rodriguez "failed to do his job and failed in his duties in disqualifying me from the Recall Petition."  *Id.*

Plaintiffs also submit numerous other affidavits of persons identifying themselves as signers of the recall petition, and who state that they signed the petition "freely, voluntarily and because I want the City of San Juan to hold a recall election of those City Commissioners who are named in the Recall Petition."  *Id.*  All but one of the affidavits state that "[m]y signature was disqualified without my consent."  *Id.*

Finally, Plaintiffs present a copy of the minutes from the December 21, 2010 City Commission meeting, and draw the Court's attention to Munoz's recommendation that Rodriguez be allowed "to proceed as necessary [with] anything he would need to verify the signatures on the recall petition."  (Dkt. No. 116, Exh. F).  When the Mayor then "asked if decisions that are needed could be presented to them," Munoz responded, "how could [Rodriguez do that if he] only has (30) days and also [Recall Plaintiff] Trevino filed a lawsuit with a restraining order keeping [Rodriguez] from doing his job."  *Id.*  Munoz then

---

[11] Recall Plaintiff Minerva Navarro's middle initial is "J."  (Dkt. No. 114, Exh. C).

recommended that Rodriguez be allowed to "do[ ] whatever he needs to do by following the city charter…to validate and verify all the signatures on the recall petition." *Id.* When asked in his deposition what Munoz's words meant to him, Rodriguez responded, "To continue doing what I had been doing…when I was reviewing the signatures." (Dkt. No. 115, Exh. D. at p. 105).

5.  **Rodriguez Entitled to Summary Judgment on First Amendment Claims**

    a.  **No First Amendment Violation or Retaliation**

    Turning to the merits of Rodriguez's Motion and the parties' responsive briefing (Dkt. Nos. 83, 107, 140), the Court finds that Rodriguez is entitled to summary judgment on Plaintiffs' First Amendment claims against him. First, the Court agrees that Plaintiffs cannot show that Rodriguez deprived them of their right to circulate and submit the petition because the record is undisputed that they did so without interference from him; although Rodriguez allegedly provided untimely notification that the first petition was deficient, he still gave Plaintiffs the time allotted by the Charter to submit an amended petition, which they did. *See* (Dkt. No. 83). The Court also agrees that the record does not raise a genuine fact issue on whether the means used by Rodriguez to disqualify signers to the petition violated Plaintiffs' right to petition or constituted retaliation. *See* (Dkt. Nos. 83, 140). Plaintiffs advance the theory that a First Amendment violation lies in Rodriguez's failure to follow the Charter upon submission of the petition, and in his intentional disqualification of legally qualified voters, but the evidence itself does not support this theory. *See* (Dkt. No. 107).

    b.  **Rodriguez's Actions under Charter**

    Plaintiffs' response asserts that Rodriguez failed to apply § 11.01 of the Charter, but this provision applies to ordinances, and in any event contains the same requirement applicable to recall petitions under § 11.07, the provision followed by Rodriguez: the petition must be signed

by at least 10% of the qualified voters in the last City election. Plaintiffs also appear to argue that the Charter required Rodriguez to determine whether each signer was a qualified voter without consulting with Munoz or anyone else, and without "resort to a criminal investigation." The Court first notes that § 11.03 prohibits the counting of signatures "where there is reason to believe it is not the actual signature of the purported signer," a belief that apparently existed and was investigated, although not by Rodriguez. Further, as the Charter itself does not specify how to determine whether a signer is qualified, Rodriguez did not fail to follow the Charter by speaking to City Attorney Munoz, consulting with outside counsel and an expert, and using information from the election website of the Secretary of State to perform his duties. Although Plaintiffs complain that Rodriguez could have employed other means for verifying signatures, the Charter did not so require, and Plaintiffs' suggestion that Rodriguez could have used City police to verify Recall Plaintiff Navarro's signature is baffling given Plaintiffs' additional challenges to police involvement in the recall process. Finally, Plaintiffs appear to assert that Rodriguez violated § 11.04 by failing to notify Plaintiffs within 30 days that their initial petition was insufficient, and by taking no action on the amended petition. However, the alleged two-day delay in notification was inconsequential given that Rodriguez still allowed Plaintiffs the requisite amount of time in which to submit their amended petition. When the amended petition also lacked the required number of qualified voter signatures, Rodriguez complied with § 11.04 by taking no action on it. Plaintiffs have identified no Charter violation by Rodriguez, much less any violation that raises the spectre of a First Amendment violation or retaliation.

c. **Rodriguez's Disqualification of Signers to Petition**

Plaintiffs also attempt to show that Rodriguez intentionally disqualified legally qualified voters, but again, the record fails to raise a genuine fact issue on this point. Rodriguez presents

evidence that he determined whether a signer was a qualified voter in the City of San Juan by comparing identifying information provided in the petition with information obtained through the Secretary of State election website. Notably, the evidence is uncontested that outside counsel Bullock made his own determination, and both concluded that the initial and amended petitions lacked the required number of qualified voter signatures. Through his affidavit, Rodriguez explains that he disqualified Recall Plaintiff Navarro based on his determination that she had not provided the correct voter identification number or driver's license number listed by the Secretary of State for her name. Further, a voter with her name and date of birth was registered in a precinct different from the one specified in the petition. Plaintiffs present evidence that Navarro has maintained the same address and voted in City elections without incident for many years, and that Rodriguez could not explain in his deposition why he disqualified her signature, but this evidence does not controvert the explanation provided in Rodriguez's affidavit. Moreover, Navarro's own affidavit states that there is another City voter with the same first and last name; to the extent that Rodriguez's disqualification of Recall Plaintiff's signature was a mistake, it was not retaliatory. Plaintiffs also offer the affidavits of numerous persons stating that they signed the petition voluntarily and that their signatures were disqualified without their consent. However, the affiants' intention at the time of signing, and that they were not consulted prior to disqualification, does not contradict Rodriguez's explanation that he used objective means to verify whether they were in fact qualified voters. Plaintiffs also suggest that Rodriguez made copies of the petition's signature pages for Munoz in order "to help start a criminal investigation," but this theory is conjecture and does not carry the evidentiary weight necessary to defeat summary judgment. Finally, the simple fact that Rodriguez was hired by a Commission that included those individuals subject to the attempted recall does not transform his actions into

unconstitutional ones.

### d. Rodriguez Entitled to Qualified Immunity

In sum, the Court finds that the record does not place in genuine dispute whether Rodriguez's actions or inaction as City Secretary violated Plaintiffs' right to petition, caused Plaintiffs to suffer any injury that would "chill a person of ordinary firmness" from exercising the right to petition, or were substantially motivated against the exercise of that right. Moreover, even if it did, the Court finds that the "contours" of Plaintiffs' right to petition were not sufficiently clear such that a reasonable official would understand that the particular means chosen by Rodriguez to exercise his duties under the Charter would violate that right. The Court concludes that Rodriguez is entitled to the defense of qualified immunity, and therefore to summary judgment on any First Amendment claim against him.

## E. Conspiracy to Violate § 1983

Plaintiffs assert a cause of action against all Defendants under § 1983 for conspiracy to commit the constitutional violations asserted elsewhere in their pleading. (Dkt. No. 104 at § VIII). To prevail on this claim, a plaintiff must show: (1) an agreement between private and public defendants to commit an illegal act; and (2) an actual deprivation of constitutional rights. *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994). As Rodriguez's Motion points out, "mere conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy." *McAfee v. 5th Cir. Judges*, 884 F.2d 221, 222 (5th Cir. 1989) (quoting *Brinkmann v. Johnston*, 793 F.2d 111, 113 (5th Cir. 1986)) (internal quotations omitted); (Dkt. No. 83). Here, the record does not raise a genuine issue of material fact on whether Rodriguez acted pursuant to a conspiracy to violate the constitutional right of any Plaintiff. As explained *supra*, his connection to the asserted Fourth Amendment and due process violations is

too conjectural and remote, and the suggestion that Rodriguez conspired with anyone to deprive Plaintiffs of their First Amendment right to petition, or to retaliate against them for the exercise of that right, is similarly conjectural. Therefore, the Court will grant Rodriguez's request for summary judgment on Plaintiffs' conspiracy claim against him.

### III. Conclusion

For the foregoing reasons, the Court hereby **ORDERS** that Defendant Rodriguez's "Motion for Summary Judgment and Assertion of Qualified Immunity" (Dkt. No. 83) is **GRANTED**.

SO ORDERED this 13th day of June, 2014, at McAllen, Texas.

_____
Randy Crane
United States District Judge